OPINION *Page 2 
{¶ 1} Defendants-appellants Tony McCammon and Garnett McCammon appeal from the jury verdict of October 26, 2006, and the November 14, 2006, Judgment Entry of the Stark County Court of Common Pleas denying their Motion for New Trial and Judgment Notwithstanding the Verdict.
 STATEMENT OF THE FACTS AND CASE {¶ 2} On May 5, 2005, appellees David Reicosky and Bonnie Reicosky, dba Trees 4U, filed a complaint against appellants Tony and Garnett McCammon, dba Royal Garden Center. Appellees, in their complaint, alleged that appellants, in November of 2004, had recklessly cut down landscape grade trees on appellees' property. Appellees, in their complaint, sought treble damages pursuant to R.C. 901.51.
 {¶ 3} Subsequently, a jury trial commenced on October 17, 2006. The following testimony was adduced at trial.
 {¶ 4} Appellees David Reicosky and Garnett Reicosky own a tree farm in East Sparta, Ohio that consists of 65.32 acres. Appellants Tony and Garnett McCammon are the owners of Royal Garden Center in Circleville, Ohio.
 {¶ 5} In 1996, appellants Tony and Garnett McCammon had appellee ship approximately 300 balled trees to them to use as greens or tree boughs. Appellee had no contact with appellants again until 2002, when appellant Tony McCammon [hereinafter "appellant"] called and said that he wanted some boughs, but did not want the trunks of the trees. Appellee David Reicosky [hereinafter "appellee"] sent the boughs to appellant, who then took what he wanted and sent the rest back. *Page 3 
 {¶ 6} In 2003, appellant made arrangements to go to appellees' tree farm and cut his own boughs. According to appellee, appellant was instructed not to cut east of the drainage ditch on the property, but disregarded such instruction. The following is an excerpt from appellee David Reicosky's trial testimony:
 {¶ 7} "Immediately I called Mr. McCammon and I gave him a heated discussion and made it clear and on — under no uncertain terms that where he was supposed to cut and where he was not supposed to cut. I further went to the length of marking the drainage ditch with a 2___ a 2,500 foot roll of yellow and black construction safety tape. Uh, there's an example over there in my, my briefcase. Uh, and I lined the edge of the drainage ditch with that tape and I also encircled trees within that west side that he was not supposed to cut. That would be a tree that I was managing for landscape trees.
 {¶ 8} "And obviously the small amount of money that I'm getting for tree boughs from Mr. McCammon does not compare to the price that I can get for a landscape tree, and as a business owner I would rather get the most value out of my product and my commodity, so that's why I was restricting those trees for growing there. But I mark___ I completely encircled those trees with the yellow and black construction tape.
 {¶ 9} "After I did that — and, and the primary reason I did that is I, I knew Mr. McCammon knew where to go and where not to go but if he sent his crew up without him, I wanted to make sure that his crew knew precisely where to go and it was easy to identify where the line of demarcation was.
 {¶ 10} "After I did that, uh, his crew from Royal Gardens, the cutting crew, came up at least four times, got four 12 foot trailer loads of, of boughs, and there was no incidents in 2003 of them coming east of the drainage ditch." Transcript 1 at 62-63. *Page 4 
 {¶ 11} At trial, appellee testified that appellant called him in November of 2004 and wanted to come out and cut some boughs. Appellee testified that he told appellant that he could cut where he had cut the previous year, but could not cut any trees east of the drainage ditch. Appellee denied ever telling appellant that he could cut boughs east of the drainage ditch. Appellee further testified that appellant went out to the tree farm on four separate occasions in 2004 and that, on December 1, 2004, he drove over to check on appellant's cutting crew and discovered that appellant had cut trees east of the drainage ditch. The following testimony was adduced when appellee was asked what happened:
 {¶ 12} "A. Total devastation of my trees that I was managing for landscape trees. He got totally out of the — he, he came west — or excuse me, he came east of the drainage ditch. The designated area was west of the drainage ditch. He came totally east. Stand alone trees that I was managing, was ready to dig in 2005 totally destroyed, of no value to me. Totally removed my revenue stream.
 {¶ 13} "Q. Had you prior to 2004 marked any of those trees east of the drainage ditch for harvesting in 2005?
 {¶ 14} "A. Yes, I had markings there where I had, had the size markings that I go through to select a tree for digging. There were trees marked in that area that had — I had designated and was using for landscape trees.
 {¶ 15} "Q. How did you mark them?
 {¶ 16} "A. I had a, a flagging tape. A flagging tape is just a narrow piece of tape and with multiple colors. A blue and white stripe on it is a 10 foot tree. And I tie that *Page 5 
flagging around the branch of the tree so that I can easily identify it when I tie the tree up and get it ready for the ball and burlap process that we have." Transcript 1 at 72-73.
 {¶ 17} Appellee further testified that when appellant called him on December 6, 2004 asking about more tree boughs, he told appellant that he had cut out of bounds and had ruined appellee's trees. When asked whether appellant ever said anything to him about having authorization to go east of the drainage ditch, appellee responded in the negative.
 {¶ 18} Thereafter, on or about December 14, 2004, appellee sent appellant a letter seeking compensation for the damage to 211 landscape trees.
 {¶ 19} At trial, appellant testified that he and his wife, Garnett, run a garden center called Royal Gardens and that they purchase boughs for grave blankets. Appellant testified that he had never had a written contract with appellee, but that he went to appellee's tree farm in 1996 and arranged to purchase boughs from appellee. Appellant testified that, from 1997 to 2001, he did not purchase any boughs from appellee because he found another supplier.
 {¶ 20} In 2002, appellant contacted appellee again for tree boughs and arranged to come and cut the boughs himself. Appellant testified that appellee told him to cut west of the drainage ditch, which was marked off with tape. At trial, appellant further testified that he had the same arrangement in 2003 as to where he could cut boughs and that the parties' arrangement was that appellant could cut anywhere west of the drainage ditch. According to appellant, at such time, there was a limited supply of greenery on the west side of the ditch. As a result, appellant also had to obtain boughs *Page 6 
from another supplier. Appellant testified that he only paid appellee $944.00 in 2003 in contrast to $3,476.00 in 2002.
 {¶ 21} Appellant further testified that, due to the scarcity of boughs on the west side of the drainage ditch, he called appellee in 2004 and told appellee that "there's no way we can come back . . . I said, there's not enough greenery on that [west] side. I said, we'd have to go to the west — or to the east side of the ditch to get enough." Transcript II at 92. The following testimony was adduced when appellant was asked how appellee responded:
 {¶ 22} "A. And he said, No, I don't want you to, and I said, All right, but I said, That's the only way we can come back. And I said — you know, I said, But if you would allow us to pick the trees out of there, the big ones, you know, or the ones that's not usable. And that's when we discussed the different things and the trees, and I said you know, if we took a stand alone tree, we could — you know, we wouldn't touch those, and he said, I don't want you touching any one I've got marked, and then we discussed doing that.
 {¶ 23} "Q. Okay. So tell me more specifics about that discussion, what did you actually discuss?
 {¶ 24} "A. So I asked him how big of trees he could dig, and he says he could dig up to 16 feet.
 {¶ 25} "Q. Okay.
 {¶ 26} "A. And I said, All right. I said, So if we was to go in there and not touch anything that was 16 feet or less, you'd be all right with that. And I still wasn't clear for *Page 7 
quite awhile talking to him, and then he said, Well, let's have a gentlemen's agreement that you won't go farther south than the power lines.
 {¶ 27} "Q. All right.
 {¶ 28} "A. And then he made that statement, I knew that he knew that we was crossing the ditch because the power lines had no relevance in the previous two years at all, they've never been mentioned.
 {¶ 29} "Q. All right. What did he say specifically about the power lines?
 {¶ 30} "A. He just said, Let's just have a gentlemen's agreement that you'll stay north of the power lines.
 {¶ 31} "Q. All right. Now, and um —
 {¶ 32} "A. Toward the north side.
 {¶ 33} "Q. The north side of the property?
 {¶ 34} "A. Right.
 {¶ 35} "Q. And as we showed already, you in 2003 were already cutting greenery south and all west of the ditch, right?
 {¶ 36} "A. Right.
 {¶ 37} "Q. So the arrangement was that you could cut trees east of the ditch, right?
 {¶ 38} "A. Beg your pardon?
 {¶ 39} "Q. That you can — in 2004 the arrangement was that you could cut greenery or boughs east of the ditch, right.
 {¶ 40} "A. Correct. *Page 8 
 {¶ 41} "Q. All right. Now, explain again more details the specifics of that conversation. How did it end?
 {¶ 42} "A. I — it ended with me knowing that we could cross that ditch and that we could cut anything up to 16 feet unless it was a stand alone. You know, if the trees were growing together, we could cut it.
 {¶ 43} "Q. Okay.
 {¶ 44} "A. But if it was a stand alone tree, that we wasn't to touch it up to 16 feet, or anything that, that was salable. And we've sold trees for enough years that I think that we knew that." Transcript II at 93-95.
 {¶ 45} According to appellant, the two did not discuss what was meant by the term "stand alone" tree. Based on his conversation with appellee, appellant cut trees east of the ditch on four occasions in 2004.
 {¶ 46} At trial, appellant's wife, appellant Garnett McCammon, testified that, in 2004, she heard her husband speaking on the phone with appellee and heard him tell appellee that all of the greenery available on the west side of the drainage ditch had been exhausted. She further testified that she heard her husband say that they would not cut any stand alone trees. Appellant Garnett McCammon testified that, based on such conversation, there was no doubt in her mind that her husband had been given permission to cut on the east side.
 {¶ 47} At the conclusion of the evidence and the end of deliberations, the jury, on October 19, 2006, found in favor of appellees and against appellants and awarded appellees damages in the amount of $35,645.00. The jury, in its response to interrogatories, found that appellants had acted recklessly. *Page 9 
 {¶ 48} Pursuant to a Judgment Entry filed on October 26, 2006, the trial court granted appellees' Motion for Treble Damages pursuant to R.C. 901.51 and awarded appellees damages in the amount of $106,935.00 plus interest.
 {¶ 49} On November 8, 2006, appellants filed a "Motion for New Trial and Judgment Notwithstanding the Verdict." With respect to their Motion for Judgment Notwithstanding the Verdict, appellants argued there was insufficient evidence to establish recklessness or damages. With respect to their Motion for New Trial, appellants argued that the order of interrogatories was prejudicial. As memorialized in a Judgment Entry filed on November 14, 2006, the trial court denied such motion.
 {¶ 50} Appellants raised the following assignments of error on appeal:
 {¶ 51} "I. THE TRIAL COURT ERRED IN ENTERING JUDGMENT FOR PLAINTIFF ON THE JURY VERDICT.
 {¶ 52} "II. THE TRIAL COURT ERRED IN DENYING DEFENDANT'S MOTION FOR NEW TRIAL."
 {¶ 53} Pursuant to an Opinion filed in the case sub judice on February 19, 2008, this Court affirmed the judgment of the trial court. Thereafter, on February 29, 2008, appellants filed a Motion for Reconsideration. Pursuant to a Judgment Entry filed on April 9, 2008, we granted such motion and vacated our February 19, 2008, Opinion and Judgment Entry. We shall now address appellants' assignments of error on reconsideration. *Page 10 
 I {¶ 54} Appellants, in their first assignment of error, argue that the trial court erred in denying their Motion for Directed Verdict and their Motion for Judgment Notwithstanding the Verdict. We disagree.
 {¶ 55} In the case sub judice, appellees sued appellants under R.C. 901.51. Such section states as follows: "No person, without privilege to do so, shall recklessly cut down, destroy, girdle, or otherwise injure a vine, bush, shrub, sapling, tree, or crop standing or growing on the land of another or upon public land. In addition to the penalty provided in section 901.99 of the Revised Code, whoever violates this section is liable in treble damages for the injury caused."
 {¶ 56} The Ohio Supreme Court, in Wooten v. Knisely,79 Ohio St.3d 282, 1997-Ohio-390, 680 N.E.2d 1245, held that the term "recklessly," as used in R.C. 901.51, has the same meaning in a civil claim for treble damages as such term is defined in R.C. 2901.22(C). Such section states that: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."
 {¶ 57} In the case sub judice, appellants moved for a directed verdict, arguing that appellees had failed to present evidence that appellants acted recklessly or wantonly and also that appellees failed to present evidence of their actual losses. *Page 11 
Appellants now argue that the trial court erred in denying their Motion for a Directed Verdict and their Motion for Judgment Notwithstanding the Verdict on such basis.
 {¶ 58} While appellants argue that the court erred in overruling their Motion for Directed Verdict and their Motion for Judgment Notwithstanding the Verdict, our standard of reviewing both motions is the same. In Posin v. A.B.C. Motor Court Hotel, Inc. (1976),45 Ohio St.2d 271, 344 N.E.2d 334, the Ohio Supreme Court held a trial court must construe the evidence adduced at trial and any facts established by admissions in the pleadings and record most strongly in favor of the party against whom the motion is made. If it finds there is substantial evidence to support the non-movant's case, upon which reasonable minds may reach different conclusions, the court must overrule the motion. The trial court does not determine weight of the evidence or credibility of witnesses.
 {¶ 59} In Wagner v. Roche Laboratories, 77 Ohio St.3d 116,1996-Ohio-85, 671 N.E.2d 252, the Supreme Court noted under the reasonable minds test, the court must determine whether there is any evidence of substantial probative value in support of the claims of the non-moving party. Although the court must review the evidence in deciding the motion, a motion for directed verdict raises only questions of law, Id. On questions of law, this court reviews a trial court's judgment de novo.
 {¶ 60} Upon our review of the record, we find that the trial court did not err in denying either motion. As is stated above, appellants, in their brief, maintain that the evidence did not support a finding of recklessness or wantonness. Appellants note that they had permission to be on appellees' property to cut boughs and note also that they left many landscape quality trees on the east side of the drainage ditch untouched. *Page 12 
Appellants also emphasize that they only cut boughs from trees that they determined met certain criteria.
 {¶ 61} However, at trial, appellee testified that he did not give appellants permission to cut trees east of the drainage ditch. Testimony was adduced at trial that after appellant, in 2003, cut trees on the east side of the drainage ditch and destroyed some landscape trees, appellee contacted appellant and told him that he was not permitted to cut trees on the east side of the ditch. When questioned at trial, appellee denied ever giving appellant permission to cut east of the drainage ditch. He further testified that appellant cut trees on the east side that were landscape quality trees.
 {¶ 62} Based on appellee's testimony, we find that the trial court did not err when it denied appellants' Motion for Directed Verdict and when it entered judgment in favor of appellees on the jury verdict. While appellants argue that the evidence showed only a misunderstanding between the parties as to what trees could be cut, we note that the jury, as trier of fact, was in the best position to assess credibility. The jury clearly found appellee's testimony, that he never gave appellants permission to cut trees on the east side of the ditch to be credible.
 {¶ 63} As is stated above, appellants also argue that the trial court erred in denying both of their motions because appellees did not establish their damages. Appellants specifically contend that the trial court erred in allowing the matter to go to the jury because appellees presented evidence with respect to gross profits for the sale of the trees but no evidence with respect to the cost in effecting the sale of the trees. Appellants maintain that, therefore, appellees did not prove their actual loss. *Page 13 
 {¶ 64} In the case sub judice, appellee David Reicosky testified that he sent a letter to appellants on or about December 14, 2004, stating that appellants had damaged 211 landscape trees. When asked how he arrived at a damage figure of $35,654.00, appellee testified that he took his price list for his balled and burlapped landscape trees and multiplied the price by the quantity of each tree in a size category. He further testified that, after his initial assessment of damages in December of 2004, he more thoroughly assessed the number of landscape trees that were cut east of the drainage ditch and determined that a total of 266 landscape trees were damaged rather than 211. Appellee testified that the total value he placed on all 266 trees was $45,005.00.
 {¶ 65} Appellees' expert, Ernest Frank, who has been in the tree business for over 27 years, testified at trial that he went out to appellees' property in the summer of 2005 to look at the damaged trees and determined that the trees were not marketable.
 {¶ 66} As is stated above, appellants specifically argue that appellees failed to meet their burden of proving damages because they only produced evidence of the list price of the landscape trees and, therefore, did not prove actual loss. Appellants contend that appellees did not take into account the expenses associated with the sale of the trees, which they did not have to pay in this case because the trees were ruined. Appellants note that if appellees had sold balled and burlapped trees at the list price, they would have expended labor and material in facilitating the sales.
 {¶ 67} However, appellee, when cross-examined during his case in chief, was questioned about his expenses in digging trees out. Appellee testified that his expenses were "right close to 15 percent of the sale price" and that his expenses *Page 14 
included labor, fuel, burlap, basket, herbicides and chemicals. Transcript I at 184-185. The following testimony was adduced when appellee was cross-examined about his damages:
 {¶ 68} "Q. That, uh — I mean, you have damages here today of $45,005, right?
 {¶ 69} "A. Correct.
 {¶ 70} "Q. That's not taking expenses off?
 {¶ 71} "A. That's correct.
 {¶ 72} "Q. Okay, that's the gross amount?
 {¶ 73} "A. That would have been my sale price, yes.
 {¶ 74} "Q. All right. Um, are you able to testify today what the net amount would be for each tree?
 {¶ 75} "A. 15 percent is — minus whatever's on that list.
 {¶ 76} "Q. Okay, so I could take those numbers and subtract right off of it 15 percent; is that right?
 {¶ 77} "A. (Nods)
 {¶ 78} "Q. I mean, you don't — is that true?
 {¶ 79} "A. You could do that, yes.
 {¶ 80} "Q. I mean, if you're selling a tree for landscape value of 90 — $190, I mean, that's not what you're getting because you've got to get that plus — minus what you put into the tree, right?
 {¶ 81} "A. True.
 {¶ 82} "Q. Okay. Are you asking the McCammons to pay for your expenses as well? *Page 15 
 {¶ 83} "A. I put out an offer there and I've requested the payment on it because that's what it cost me." Transcript I at 186-187.
 {¶ 84} Thus, there was evidence before the jury of appellees' expenses associated with the sale of trees. In short, contrary to appellants' assertion, we find there was evidence before the jury as to appellees' lost profits.
 {¶ 85} Appellants also contend that appellee's testimony as to his costs was not credible because his tax returns, which were admitted at trial, show that appellees could not have made a profit of 85% per tree. Appellants, for example, note that the 2002 tax returns for appellees' business showed gross receipts of $22,756.00 but net income of only $4,269.00. However, we note that such evidence was before the jury. The jury, as trier of fact, is in the best position to assess credibility.
 {¶ 86} Moreover, appellants contend that it is clear that the jury believed that appellees gave them an "incomplete picture" of damages because they only awarded appellees damages for the loss of 211 trees. Appellants note that, at trial, appellee claimed that 266 trees were damaged. However, as is stated above, appellee originally only alleged that 211 trees were damaged. The jury apparently did not find appellee's testimony, that he later found 55 additional trees to be damaged, to be credible.
 {¶ 87} Based on the foregoing, we find that the trial court did not err in denying appellants' motion for a directed verdict and for judgment notwithstanding the verdict.
 {¶ 88} Appellants' first assignment of error is, therefore, overruled.
 II {¶ 89} Appellants, in their second assignment of error, contend that the trial court erred in denying appellants' Motion for a New Trial pursuant to Civ. R. 59. We disagree. *Page 16 
 {¶ 90} A trial court has discretion when ruling on a motion for a new trial, and a reviewing court should not disturb its decision absent an abuse of discretion. Mannion v. Sandel (2001), 91 Ohio St.3d 318, 321,2001-Ohio-47, 744 N.E.2d 759. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140.
 {¶ 91} In the case sub judice, appellants filed a Motion for a New Trial pursuant to Civ. R. 59(A). Civ. R. 59 states, in relevant part, as follows: "(A) Grounds
 {¶ 92} "A new trial may be granted to all or any of the parties and on all or part of the issues upon any of the following grounds:. . .
 {¶ 93} "(9) Error of law occurring at the trial and brought to the attention of the trial court by the party making the application; . ."
 {¶ 94} Appellants specifically contend that the trial court erred in denying their motion based on the order that the interrogatories were given to the jury. Appellants note that the jury was first given Interrogatory A which asked them to determine whether appellants were reckless and, therefore, liable for damages. Interrogatory A states as follows:
 {¶ 95} "(A) Do you find by a preponderance of the evidence that the Defendants trespassed on certain land owned by the Plaintiffs on one or more occasions during November 2004 and recklessly and without privilege to do so cut tree boughs from trees earmarked for other usage in certain areas which were off limits to the Defendants causing damage to the Plaintiffs?" *Page 17 
 {¶ 96} Appellants note that the jury then was given an interrogatory that asked them whether appellants had acted under a good faith belief that they were permitted to harvest the boughs. Interrogatory B, the second interrogatory, states as follows:
 {¶ 97} "(B) Do you find by a preponderance of the evidence that the Defendants had a good faith belief that they were permitted to cut boughs from the trees within the area of Plaintiffs' property that Plaintiffs allege they had designated as an area where no boughs were to be cut?"
 {¶ 98} According to appellants, the order of the interrogatories "negated consideration of the defense that [appellants] acted with a good faith belief that they were entitled to cut trees on [appellees'] property."
 {¶ 99} In the case sub judice, we find that the trial court did not abuse its discretion in denying appellants' Motion for a New Trial because the trial court's decision was not arbitrary, unconscionable or unreasonable. The jury's responses to the interrogatories were consistent with their general verdict in favor of appellees. Specifically, the jury, when asked in Interrogatory A whether they found by a preponderance of the evidence that appellants trespassed on certain land owned by appellees on one or more occasions during November 2004 and recklessly and without privilege to do so cut tree boughs from trees earmarked for other usage in certain areas which were off limits to appellants causing damage to appellee responded as follows: "YES."
 {¶ 100} After appellants moved for a mistrial on the basis that the jury had not answered Interrogatory B, the trial court sent the jury back to deliberate on the same. The jury's finding, with respect to Interrogatory B, that appellants did not have a good *Page 18 
faith belief that they were permitted to cut boughs was consistent with both their general verdict in favor of appellees and their response to Interrogatory A. We find, therefore, that appellants were not prejudiced by the order of the Interrogatories.
 {¶ 101} Based on the foregoing, appellants' second assignment of error is overruled.
 {¶ 102} Accordingly, the judgment of the Stark County Court of Common Pleas is affirmed.
Edwards, J., Farmer, P.J. and Wise, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Stark County Court of Common Pleas is affirmed. Costs assessed to appellants. *Page 1